UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; DEERBROOK INSURANCE COMPANY; ENCOMPASS INDEMNITY COMPANY; AND NORTHBROOK INDEMNITY COMPANY<br><br>    Plaintiffs,<br><br>vs.<br><br>EDUARDO BULLON; RAFAEL MENDEZ; ADVANCED IMAGING MRI OF MINNESOTA, LLC; SPINE IMAGING MRI, LLC;  WILLIAM J. FORD, III, M.D.; JORGE BULLON; NAIDA HERNANDEZ GONZALES; CENTRAL MEDICAL CLINIC, LLC – CLINICA CENTRAL; CENTRAL NEUROLOGY CLINIC, LLC; ALFONSO MORALES-UTRILLA, M.D.; AND HANS M. CASTRO, D.C.,<br><br>    Defendants. | Civil Action No. 10cv4636 ADM/FLN |

## COMPLAINT – DEMAND FOR JURY TRIAL

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Deerbrook Insurance Company, Encompass Indemnity Company, and Northbrook Indemnity Company (hereinafter "Allstate" and/or "plaintiffs") by its attorneys, Smith & Brink, P.C. and Stempel & Doty, P.L.C., allege as follows:

SCANNED

NOV 18 2010

U.S. DISTRICT COURT MPLS

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 7

II.     THE PARTIES .................................................................................... 9

        A.      Plaintiffs .................................................................................. 9

        B.      Defendants ............................................................................. 11

III.    JURISDICTION AND VENUE ......................................................... 12

IV.     FACTUAL BACKGROUND REGARDING THE DEFENDANTS'
        FRAUDULENT CONDUCT ............................................................... 13

        A.      The Defendants Purposely Targeted Minnesota to Exploit its Liberal No-
                Fault Laws ............................................................................... 13

        B.      The Minnesota No-Fault Insurance Act ...................................... 14

        C.      The Creation of Central Neurology Association, LLC as an Intermediary 14

        D.      Morales Replaces Magana at Central Medical .......................... 16

        E.      Summary of Defendants' Unlawful Acts .................................... 18

V.      VIOLATIONS OF THE PROHIBITION AGAINST THE CORPORATE
        PRACTICE OF MEDICINE ............................................................... 19

        A.      The Corporate Practice of Medicine Doctrine .......................... 19

        B.      Spine Imaging Operates in Violation of the Prohibition Against the
                Corporate Practice of Medicine ................................................ 20

        C.      Central Medical Operates in Violation of the Prohibition Against the
                Corporate Practice of Medicine ................................................ 22

                1.      Bullon's de facto Ownership of Central Medical ............. 22

                2.      Bullon Establishes Central Neurology Association, LLC ... 23

                3.      Bullon Establishes Central Medical to Replace Central Neurology
                        Association, LLC ............................................................ 24

|   | D. | The Defendants' Fraudulent Corporate Structure Evidences a Knowing and Intentional Failure to Abide by State Law ................................................. 26 |

VI.  CENTRAL MEDICAL WAS FRAUDULENTLY CREATED BY BULLON TO FURTHER A "PATIENT LAUNDERING" SCHEME ....................................... 27

    A.  The "Patient Laundering" Scheme............................................. 27

    B.  Central Medical Accounts for More than 80% of Spine Imaging's Patient Referrals ...................................................................................... 29

    C.  Central Medical's Patients are Unaware They Are Being Laundered Through an Intermediary .......................................................... 30

VII.  UNNECESSARY, UNJUSTIFIED AND UNWARRANTED MEDICAL TREATMENT.......................................................................................... 31

    A.  Worthless Radiologic Studies at Spine Imaging........................ 32

    B.  Upcoding at Central Medical ..................................................... 35

VIII  RACKETEERING ACTIVITY:  MAIL FRAUD ................................. 40

IX.  FRAUDULENT CONCEALMENT ..................................................... 41

X.  DAMAGES ......................................................................................... 44

XI.  CAUSES OF ACTION ....................................................................... 44

COUNT I
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act ........................... 44

COUNT II
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act ........................... 47

COUNT III
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act ........................... 49

COUNT IV
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act ........................................... 51

COUNT V
Conspiracy Under 18 U.S.C. §1962(d)
Racketeer Influenced and Corrupt Organizations Act ........................................... 54

COUNT VI
Unlawful Corporate Practice of Medicine ............................................................ 54

COUNT VII
Unlawful Corporate Practice of Medicine ............................................................ 55

COUNT VIII
Unlawful Corporate Practice of Medicine ............................................................ 57

COUNT IX
Unlawful Corporate Practice of Medicine ............................................................ 58

COUNT X
Common Law Fraud ............................................................................................ 60

COUNT XI
Disgorgement Under MINN. STAT. ANN. § 65B.54
Minnesota No-Fault Insurance Act ...................................................................... 61

COUNT XII
Violations of MINN. STAT. ANN. § 325F.69
Minnesota Prevention of Consumer Fraud Act...................................................... 62

COUNT XIII
Unjust Enrichment .............................................................................................. 64

COUNT XIV
Declaratory Relief Under 28 U.S.C. § 2201
Declaratory Judgment Act.................................................................................... 65

COUNT XV
Injunctive Relief.................................................................................................. 66

XII.   PRAYER FOR RELIEF ........................................................................................ 68

COUNT I
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act .......................................... 68

COUNT II
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act .......................................... 69

COUNT III
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act .......................................... 69

COUNT IV
Violations of 18 U.S.C. §1962(c)
Racketeer Influenced and Corrupt Organizations Act .......................................... 70

COUNT V
Conspiracy Under 18 U.S.C. §1962(d)
Racketeer Influenced and Corrupt Organizations Act .......................................... 70

COUNT VI
Unlawful Corporate Practice of Medicine ............................................................ 70

COUNT VII
Unlawful Corporate Practice of Medicine ............................................................ 71

COUNT VIII
Unlawful Corporate Practice of Medicine ............................................................ 71

COUNT IX
Unlawful Corporate Practice of Medicine ............................................................ 71

COUNT X
Common Law Fraud ............................................................................................. 72

COUNT XI
Disgorgement Under MINN. STAT. ANN. § 65B.54
Minnesota No-Fault Insurance Act ...................................................................... 72

COUNT XII
Violations of MINN. STAT. ANN. § 325F.69
Minnesota Prevention of Consumer Fraud Act...................................................... 72

COUNT XIII
Unjust Enrichment ................................................................................................. 73

COUNT XIV
Declaratory Relief Under 28 U.S.C. § 2201
Declaratory Judgment Act...................................................................................... 73

COUNT XV
Injunctive Relief..................................................................................................... 73

XIII.   JURY TRIAL DEMAND .................................................................................... 74

## I.    INTRODUCTION

1.      Unlicensed business person Eduardo Bullon ("Bullon"), working in concert with his co-conspirator, unlicensed business partner Rafael Mendez ("Mendez"), and their medical clinic, Spine Imaging MRI, LLC, the successor-in-interest to Advanced Imaging MRI of Minnesota, LLC (collectively "Spine Imaging"), along with its co-conspirator employees, William J. Ford, III, M.D. ("Ford"), Jorge "Remy" Bullon ("Remy"), Naida Hernandez Gonzales ("Gonzales"), and Alfonso Morales-Utrilla, M.D. ("Morales") through Central Medical Clinic, LLC – Clinica Central, formerly known as Central Neurology Clinic, LLC (collectively "Central Medical") and co-conspirator/recruiter Hans M. Castro, D.C. ("Castro"), engaged in a scheme to defraud Allstate by misrepresenting (1) the corporate structure of Spine Imaging and Central Medical; and (2) the necessity of medical treatment and Magnetic Resonance Imaging ("MRI") scans purportedly rendered to patients to unlawfully collect over a million dollars in basic economic loss (hereinafter "No-Fault") automobile insurance benefits that they would not otherwise be entitled.

2.      This action seeks to recover damages incurred as a result of the defendants' intentional insurance fraud scheme.

3.      The primary goal of the defendants' scheme to defraud was to perform scores of unnecessary and medically worthless medical services and MRI scans through illegally owned medical corporations, and bill Allstate demanding prompt payment under the Minnesota No-Fault Insurance Act.

4.      The defendants accomplished this goal by (1) misrepresenting that the

MRIs performed at Spine Imaging were medically justified; (2) "laundering" patients through Central Medical (i.e., falsely creating the appearance of legitimacy and concealing the fact that MRIs were medically unnecessary and worthless by originating an MRI referral from a physician); and (3) misrepresenting and/or concealing from Allstate (and the general public) that Central Medical and Spine Imaging were owned, operated and controlled by the same unlawful corporate owner(s).

5.      The defendants fabricated medical records, invoices, bills and other documents involved in the insurance claim process that were transmitted to Allstate through the U.S. Mail.

6.      Allstate reasonably relied on these falsified documents in paying over one million dollars to the defendants for medically unnecessary, unwarranted, worthless and unjustified testing and diagnostic studies.

7.      All of the conduct alleged herein was undertaken intentionally.

8.      Allstate brings this action against the above-captioned defendants seeking damages under: (1) the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1962(c)-(d)); (2) the prohibition against the corporate practice of medicine; (3) common law fraud; (4) the Minnesota No-Fault Insurance Act (MINN. STAT. ANN. § 65B.54 (subd. 4)); (5) the Prevention of Consumer Fraud Act (MINN. STAT. ANN. § 325F.69); and (6) unjust enrichment.

9.      Allstate's claim for compensatory damages includes payments made by Allstate to the defendants in reliance upon the purported provision of necessary medical treatment and MRI scans, claims handling expenses incurred by Allstate, costs of

investigating the defendants' conduct and in bringing the instant Complaint, treble

damages as authorized by law, statutory interest and attorneys fees.

10.     Allstate also seeks equitable relief in the form of a declaration that Spine

Imaging and Central Medical are operating in violation of Minnesota law (i.e. the

defendants are engaging in the prohibited "corporate practice of medicine"); that their

activities are unlawful; and that Allstate has no obligation to pay pending, previously-

denied, and/or future No-Fault insurance claims submitted by (or on behalf of) the

defendants.

11.     Allstate further seeks a permanent injunction precluding the defendants

from submitting invoices to Allstate, seeking payment and/or pursuing any and all

collection action against Allstate, and initiating any legal proceedings against Allstate,

including but not limited to, arbitration proceedings or lawsuits – in any form or

jurisdiction – seeking payment for, or equitable relief regarding, any medical treatment

purportedly rendered and/or provided to Allstate claimants.

## II.     THE PARTIES

### A.     PLAINTIFFS

12.     Allstate Insurance Company is a wholly owned subsidiary of the Allstate

Corporation, a Delaware corporation.

13.     Allstate Insurance Company's principal place of business is in Illinois.

14.     Allstate Insurance Company is duly authorized to do business in the State

of Minnesota.

15.     Allstate Indemnity Company is a wholly owned subsidiary of the Allstate

9

Corporation, a Delaware corporation.

16.     Allstate Indemnity Company's principal place of business is in Illinois.

17.     Allstate Indemnity Company is duly authorized to do business in the State of Minnesota.

18.     Allstate Property and Casualty Insurance Company is a wholly owned subsidiary of the Allstate Corporation, a Delaware corporation.

19.     Allstate Property and Casualty Insurance Company's principal place of business is in Illinois.

20.     Allstate Property and Casualty Insurance Company is duly authorized to do business in the State of Minnesota.

21.     Deerbrook Insurance Company is a wholly owned subsidiary of the Allstate Corporation, a Delaware corporation.

22.     Deerbrook Insurance Company's principal place of business is in Illinois.

23.     Deerbrook Insurance Company is duly authorized to do business in the State of Minnesota.

24.     Encompass Indemnity Company is a wholly owned subsidiary of the Allstate Corporation, a Delaware corporation.

25.     Encompass Indemnity Company's principal place of business is in Illinois.

26.     Encompass Indemnity Company is duly authorized to do business in the State of Minnesota.

27.     Northbrook Indemnity Company is a wholly owned subsidiary of the Allstate Corporation, a Delaware corporation.

28.   Northbrook Indemnity Company's principal place of business is in Illinois.

29.   Northbrook Indemnity Company is duly authorized to do business in the State of Minnesota.

**B.    DEFENDANTS**

30.   Bullon is a citizen and resident of the State of Wisconsin.

31.   Bullon is the owner, director, officer, and/or shareholder of Spine Imaging.

32.   At all relevant times, Bullon was the actual owner, director, officer and shareholder of Central Medical.

33.   Mendez is a citizen and resident of the State of New Jersey.

34.   Mendez was the owner, director, officer, and/or shareholder of Advanced Imaging MRI of Minnesota.

35.   Advanced Imaging MRI of Minnesota was a Minnesota Limited Liability Corporation with a principal place of business in Saint Paul, Minnesota.

36.   Spine Imaging MRI is a Minnesota Limited Liability Corporation with a principal place of business in Saint Paul, Minnesota.

37.   Spine Imaging MRI is the successor-in-interest to Advanced Imaging MRI of Minnesota.

38.   At all relevant times, Ford was a citizen and resident of the State of Minnesota.

39.   At all relevant times, Ford was employed by Spine Imaging.

40.   At all relevant times, Remy was a citizen and resident of the State of Minnesota.

11

41.     At all relevant times, Remy was employed by Spine Imaging and/or Central Medical.

42.     At all relevant times, Gonzales was a citizen and resident of the State of Minnesota.

43.     At all relevant times, Gonzales was employed by Spine Imaging and/or Central Medical.

44.     Gonzales is, or was known by several aliases including, without limitation "Lucy," Naida Gonzales, Naida Hernandez and/or Naida Mendez.

45.     Central Medical Clinic, LLC – Clinica Central is a Minnesota Limited Liability Company with a principal place of business in Saint Paul, Minnesota.

46.     Central Neurology Clinic, LLC was a Minnesota Limited Liability Company with a principal place of business in Saint Paul, Minnesota.

47.     Central Medical Clinic, LLC is the successor-in-interest to Central Neurology Clinic, LLC.

48.     Morales is a citizen and resident of the State of Minnesota.

49.     At all relevant times, Morales was employed by Central Medical Clinic – Clinica Central and/or Central Neurology Clinic, LLC.

50.     Castro is a citizen and resident of the State of Minnesota.

51.     At all relevant times, Castro was employed by Spine Imaging and/or Central Medical.

## III.     JURISDICTION AND VENUE

52.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §

1331 (federal question), 28 U.S.C. §1332 (diversity of citizenship), 18 U.S.C. § 1962(c)-(d), and 18 U.S.C. § 1964.  Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367.

53.     The vast majority of the wrongful acts known to Allstate as alleged herein with particularity were carried out within the District of Minnesota.

54.     Venue is proper under 28 U.S.C. § 1391(c).

## IV.     FACTUAL BACKGROUND REGARDING THE DEFENDANTS' FRAUDULENT CONDUCT

### A.     THE DEFENDANTS PURPOSELY TARGETED MINNESOTA TO EXPLOIT ITS LIBERAL NO-FAULT LAWS

55.     In or around 1998, Bullon and Mendez, two unlicensed laypersons with no medical background and/or training, left New Jersey to embark on a new business venture in Minnesota.

56.     This business was Spine Imaging (previously Advanced Imaging MRI of Minnesota, LLC) – a medical facility providing MRI scans to patients who purportedly sustained neck and back injuries as a result of motor vehicle accidents.

57.     Bullon and Mendez' efforts to enter the Minnesota No-Fault market had the primary goal of defrauding insurance companies, including Allstate.

58.     Bullon marketed Spine Imaging's services to Minnesota's chiropractic community, and claimed that Spine Imaging was responding to a previously unmet demand and/or niche market related to the chiropractic treatment of neck and spine injuries.

59.     In reality, however, Bullon selected Minnesota as the home for Spine

13

Imaging given Minnesota's liberal No-Fault insurance laws.

**B.    THE MINNESOTA NO-FAULT INSURANCE ACT**

60.    Under the Minnesota No-Fault Insurance Act, an individual injured in an auto accident may seek first-party compensation for the first $20,000 in medical expenses.

61.    Reimbursement rates are not capped by statute, allowing Bullon to set his own prices for medical services offered by Spine Imaging, including MRIs.

62.    All claims must be reimbursed as they accrue, specifically within thirty days of a demand for payment.

63.    The only limitation on the payment of No-Fault benefits is that the expenses must be "medically necessary."

64.    If an expense is not medically justified, an insurer can deny payment.

65.    No-Fault insurance claims warrant scrutiny to combat the widespread existence of fraud.

66.    To evade No-Fault insurers' scrutiny, Bullon formed a second entity to create a false cloak of legitimacy concerning patient referrals.

**C.    THE CREATION OF CENTRAL NEUROLOGY ASSOCIATION, LLC AS AN INTERMEDIARY**

67.    In or around April of 1999, Bullon incorporated Central Neurology Association, LLC.

68.    Central Neurology Association's medical practice began operating in an office adjacent to Spine Imaging.

69.     Rafael Magana, M.D. ("Magana") was recruited, hired and installed as a physician in this medical practice established by Bullon.

70.     Bullon listed Magana as the owner of Central Neurology Association to legitimize the practice.

71.     Central Neurology Association served as an intermediary that enabled Bullon's "patient laundering" scheme to flourish.

72.     An intermediary was necessary to prevent detection by Allstate's special investigations unit whereas: (1) referrals from chiropractors to physicians for patient examinations did not generate much scrutiny; and (2) it legitimized the MRI referrals, by concealing the fact that the referrals were not medically necessary.

73.     These MRI referrals, however, were fraudulent.

74.     The medical treatment at Central Neurology Association was minimal, typically consisting only of an initial patient consultation and an occasional patient re-examination(s).

75.     After meeting briefly with a patient, Magana escorted the patient to Spine Imaging (which was located in the adjoining office suite) for multiple MRIs, regardless of the medical justification for these procedures.

76.     This "referral" was required by Bullon, and was a predetermined result of a patient examination at Central Neurology Association.

77.     In return, Magana was compensated by Bullon for providing the referral. Bullon's payments to Magana in connection with the MRI referrals represent a clear and direct violation of Minnesota's anti-kickbacks (MINN. STAT. ANN. § 62J.23) and fee-

splitting statutes (MINN. STAT. ANN. §§ 147.091(p) and 148.10(a)(16)).

### D.   MORALES REPLACES MAGANA AT CENTRAL MEDICAL

78.   The scheme almost came to an abrupt end in 2000 when Magana's medical license was indefinitely suspended by the Minnesota Board of Medical Practice as a result of: (1) a DUI conviction; (2) Magana's history of drug and alcohol abuse; and (3) Magana's self-prescribing of medication.

79.   Rather than discontinue business operations and return to New Jersey, Bullon recruited Morales to replace Magana.

80.   Morales' recruitment as the new "paper owner" of Central Neurology Association allowed the scheme to continue.

81.   Following Morales' recruitment in 2000, Bullon incorporated Central Neurology Clinic, LLC (which later became Central Medical Clinic, LLC – Clinica Central), and listed Morales as the owner.

82.   Central Medical continued to operate in the office space previously occupied by Central Neurology Association, adjacent to Spine Imaging.

83.   Central Medical continued to operate in the same manner as Central Neurology Association – that is, Central Medical continued to serve as an intermediary to enable Bullon's "patient laundering" scheme.

84.   Morales continued to initiate automatic "sham" referrals to Spine Imaging for costly and unnecessary MRI scans.

85.   Since Central Medical's inception, 96% of Allstate claimants treated at Central Medical were referred to Spine Imaging for MRIs.

86.     Morales was similarly compensated by Bullon for each MRI referral.  The Bullon-Morales referral compensation payments represent clear and direct violations of Minnesota's anti-kickbacks (MINN. STAT. ANN. § 62J.23) and fee-splitting statutes (MINN. STAT. ANN. §§ 147.091(p) and 148.10(a)(16)).

87.     At all relevant times, Central Medical was owned, operated and under the control of Bullon – not Morales.

88.     At all relevant times, Magana and Morales were under Bullon's control.

89.     Morales did not exert any independent business judgment over the clinic he supposedly owned.

90.     Bullon masterminded the "patient laundering" scheme.

91.     Bullon was in charge of personnel decisions for both Central Medical and Spine Imaging.

92.     Bullon exercised exclusive operational control of both Spine Imaging and Central Medical.

93.     Bullon employed Remy and Gonzales to work at Central Medical.

94.     Remy is Bullon's brother.

95.     Gonzales is, or was, married to Remy.

96.     Upon information and belief, Gonzales is also related to Mendez.

97.     Upon information and belief, Remy and Gonzales' primary job functions were to supervise Morales, and report his daily activities to Bullon.

98.     Bullon also employed licensed radiologists, including, but not limited to Ford, in violation of Minnesota's long-standing prohibition against the corporate practice

17

of medicine.

99.     Bullon continues to employ medical professionals in violation of

Minnesota's prohibition against the corporate practice of medicine, despite being a party

to multiple lawsuits involving his illicit employment of medical professionals. These

lawsuits placed Bullon on actual notice that lay ownership of a medical practice is

prohibited under Minnesota law.

E.     **SUMMARY OF DEFENDANTS' UNLAWFUL ACTS**

100.     The defendants' scheme to defraud Allstate was contingent upon a

succession of material misrepresentations made with the purpose of concealing the

medically unnecessary and/or worthless nature of expensive MRI scans.

101.     The defendants' fraudulent objectives were accomplished through a pattern

of unlawful acts including, those identified in paragraphs 102 through 108.

102.     The defendants intentionally misrepresented the ownership of Spine

Imaging by failing to disclose that it was under the ownership and control of laypersons

in violation of Minnesota law concerning the prohibition against the corporate practice of

medicine.

103.     The defendants intentionally concealed the layperson ownership and

control of Central Medical in violation of Minnesota law concerning the prohibition

against the corporate practice of medicine.

104.     The defendants engaged in a "patient laundering" scheme to conceal the

source of patient referrals to Spine Imaging for medically unnecessary and unjustified

MRI scans.

18

105.    The defendants intentionally misrepresented the necessity of medical services in connection with invoices submitted to Allstate for reimbursement under the Minnesota No-Fault Insurance Act.

106.    The defendants fabricated medical records, bills, invoices and other documents involved in the insurance claims process, and forwarded them to Allstate through the U.S. Mail.

107.    The defendants intentionally paid illegal referral fees, kickbacks, and fee-splits in violation of Minnesota law.

108.    The defendants fraudulently concealed the above-referenced unlawful acts to evade scrutiny and investigation by Allstate.

## V.    VIOLATIONS OF THE PROHIBITION AGAINST THE CORPORATE PRACTICE OF MEDICINE

### A.    THE CORPORATE PRACTICE OF MEDICINE DOCTRINE

109.    In 1933, the Minnesota Supreme Court proscribed the employment of learned medical professionals by a lay corporation. *See Granger v. Adson*, 250 N.W. 722, 723 (Minn. 1933).

110.    This prohibition was deeply rooted in the public policy considerations "raised by the specter of lay control over professional judgment, commercial exploitation of health care practice, and the possibility that a health care practitioner's loyalty to a patient and an employer will be in conflict." *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 703 N.W.2d 513, 517 (Minn. 2005).

111.    A cause of action exists against a lay corporation engaged in the practice of

19

medicine if the health care practitioners (1) are engaged in "healing" as defined by MINN. STAT. ANN. § 146.01; (2) are members of a state licensed profession; (3) undergo significant training and education; and (4) enjoy independent professional judgment. *Id.* at 522.

**B.  SPINE IMAGING OPERATES IN VIOLATION OF THE PROHIBITION AGAINST THE CORPORATE PRACTICE OF MEDICINE**

112.  Spine Imaging is a corporate entity engaged in the business of providing MRI scans.

113.  The results of the MRI scans are used to assist in the diagnosis and treatment of various medical conditions, often related to the neck and spine.

114.  Presently, Spine Imaging is solely owned and operated by Bullon.

115.  Advanced Imaging, Spine Imaging's predecessor-in-interest, was incorporated by Bullon and Mendez.

116.  Advance Imaging and Spine Imaging were never owned, operated or controlled by a licensed medical professional.

117.  Spine Imaging hires, employs and/or contracts with radiologists and other medical professionals including, without limitation, Ford.

118.  Ford is a radiologist, licensed by the Minnesota Board of Medical Practice.

119.  By analyzing and reviewing MRI scans and other radiologic studies, Ford engages in the practice of "healing" (as defined by MINN. STAT. ANN. § 146.01) by engaging in, or holding himself out to the public as partaking in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments sustained by his patients.

120.    Ford has attained significant education, training and experience in the provision of diagnostic radiology services.

121.    As a licensed physician, Ford should enjoy unfettered independent medical judgment to (1) diagnose and treat injuries; (2) prescribe medication; and (3) refer patients for additional treatment/testing when appropriate.  By law, no one is required to review Ford's work, diagnosis or recommendations for treatment.

122.    Instead, however, in violation of Minnesota law, Ford is subordinate to Bullon.

123.    Ford is paid by Spine Imaging.

124.    Ford maintains no ownership interest in Spine Imaging.

125.    Spine Imaging, however, gives the appearance to the general public that it is owned, operated and controlled by Ford.

126.    The picture annexed hereto as Exhibit 1 shows Ford's name conspicuously posted on Spine Imaging's door.

127.    Displaying Ford's name in this manner creates the false appearance to the general public that Ford owns, operates and/or controls Spine Imaging.

128.    Under Minnesota law, medical providers are required to submit a demand for payment to an insurer using Health Insurance Claim Forms, CMS-1500 ("HICF"). *See* MINN. STAT. ANN. § 62J.52.

129.    Every HICF contains a "False Information Clause," which lists the following disclaimer:

Any person who knowingly files a statement of claim containing any

21

misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

130.    Despite the False Information Clause of the HICF, Spine Imaging forwarded false bills, invoices, HICFs and other insurance claims documents to Allstate through the U.S. Mail, along with a demand for payment.

131.    The invoices submitted by Spine Imaging to Allstate demanding payment include charges for the services purportedly performed by Ford.

132.    The charges for Ford's purported services are submitted by Spine Imaging to Allstate on HICFs, which list Spine Imaging as the treating physician (box 31), service facility (box 32) and billing provider (box 33).  An example of a HICF submitted by Spine Imaging is annexed hereto as Exhibit 2.

133.    Neither Spine Imaging nor Ford submits separate bills to Allstate for their own services.

134.    When mailing HICFs to Allstate demanding payment, Spine Imaging held itself out as a legitimate medical facility duly authorized to seek payment pursuant to the Minnesota No-Fault Insurance Act.

135.    Spine Imaging also represented to Allstate that it was seeking compensation for necessary medical treatment of injuries sustained in motor vehicle accidents.

### C.    CENTRAL MEDICAL OPERATES IN VIOLATION OF THE PROHIBITION AGAINST THE CORPORATE PRACTICE OF MEDICINE

#### 1.    BULLON'S DE FACTO OWNERSHIP OF CENTRAL MEDICAL

136.    Bullon misrepresents the ownership structure of the Central Medical

entities.

137.   According to documents on file with the Minnesota Secretary of State, Morales is listed as the owner of Central Medical.

138.   Notably, Central Medical has been listed as an "inactive" corporation since 2007.

139.   Thus, since 2007, Central Medical has operated as a medical clinic (and has billed Allstate for treatment) despite its "inactive" status with the Secretary of State.

140.   Although Morales is listed as the owner of Central Medical, Bullon is the de facto owner of Central Medical.

141.   Morales is merely Bullon's "puppet," and Morales has no authority to engage in independent decision-making, or exert any independent business judgment over the day-to-day operations of Central Medical.

142.   Morales is supervised and closely watched by Gonzales and/or Remy – employees (and relatives) hired by Bullon.

143.   Gonzales and/or Remy record Morales' daily actions, and are required by Bullon to report same directly to Bullon.

144.   Bullon makes all personnel decisions for Central Medical, including the hiring and firing of Central Medical employees without Morales' knowledge.

2.     BULLON ESTABLISHES CENTRAL NEUROLOGY ASSOCIATION, LLC

145.   Prior to the current incarnation involving Morales as the "paper owner" of Central Medical, the defendants perpetrated this fraud employing Magana as the referring physician at Central Neurology Association.

23

146.    Magana was a medical doctor licensed by the Minnesota Board of Medical Practice until January 13, 2001, when his license was indefinitely suspended.

147.    Magana underwent significant training and education to become a physician licensed to practice medicine in the State of Minnesota.

148.    Magana was engaged in the practice of "healing" (as defined by MINN. STAT. ANN. § 146.01) by engaging in, or holding himself out to the public as partaking in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments sustained by his patients.

149.    As a licensed physician, Magana should have enjoyed unfettered independent medical judgment and was permitted to (1) diagnose and treat injuries; (2) prescribe medication; and (3) recommend patients for additional treatment and testing. Nobody was required to review Magana's work, diagnosis or recommendations for treatment.

150.    Instead, however, in violation of Minnesota law, Magana was subordinate to Bullon.

151.    Magana was compensated by Central Neurology Association for his services.

> 3.    BULLON ESTABLISHES CENTRAL MEDICAL TO REPLACE CENTRAL NEUROLOGY ASSOCIATION, LLC

152.    When Magana's medical license was suspended, Bullon recruited, hired and installed Morales as the treating physician at Central Medical.

153.    Morales is a physician, licensed by the Minnesota Board of Medical

Practice.

154.   Morales has attained significant training and education in the field of medicine.

155.   Morales engages in the "practice of healing" by engaging in, or holding himself out to the public as a physician who engages in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments sustained by his patients.

156.   As a licensed physician, Morales should enjoy unfettered independent medical judgment, and is permitted to (a) diagnose and treat injuries; (b) prescribe medication; and (c) refer patients for additional treatment and testing where appropriate. By law, no one is required to review Morales' work, diagnosis or recommendations for treatment.

157.   Instead, however, in violation of Minnesota law, Morales is subordinate to Bullon.

158.   Morales is compensated by Central Medical for his services.

159.   Central Medical submits bills to Allstate demanding payment for services purportedly performed by Morales.

160.   Despite the False Information Clause of the HICF, Central Medical forwarded bills, invoices, HICFs and other insurance claims documents to Allstate through the U.S. Mail, along with a demand for payment.

161.   In each document mailed to Allstate, Central Medical held itself out as a legitimately organized medical facility under Minnesota law, duly authorized to seek payment pursuant to the Minnesota No-Fault Insurance Act.

162.   Central Medical also represented to Allstate that it was seeking compensation for necessary medical treatment of injuries sustained in motor vehicle accidents.

**D.    THE DEFENDANTS' FRAUDULENT CORPORATE STRUCTURE EVIDENCES A KNOWING AND INTENTIONAL FAILURE TO ABIDE BY STATE LAW**

163.   The defendants' conduct evidences a knowing and intentional failure to abide by state law.

164.   In 2002, Spine Imaging began filing a series of lawsuits seeking a declaration that it was not operating in violation of the corporate practice of medicine doctrine. *See, e.g., Advanced Imaging MRI of Minnesota, LLC v. State Farm*, United States District Court for the District of Minnesota, docket no. 0:02-cv-00630-DSD-SRN; *Spine Imaging MRI, LLC v. Liberty Mutual, et. al.*, United States District Court for the District of Minnesota, docket no. 0:09-cv-01963-JRT-AJB; *Spine Imaging MRI, LLC v. Country Cas. Ins. Company, et.al.*, United States District Court for the District of Minnesota, docket no. 0:10-cv-00480-JRT-AJB.

165.   Not surprisingly, Spine Imaging has never obtained such a formal declaration from the Court.

166.   In each of these lawsuits, Spine Imaging was represented by counsel.

167.   In each of these cases, Spine Imaging was aware of the 1933 ruling by the Minnesota Supreme Court, which expressly prohibited a corporation, owned by laypersons, from engaging the services of licensed professionals. *See Granger*, 250 N.W. at 723.

168.   In each of these cases, Spine Imaging was aware that *Granger* was still binding legal precedent.

169.   Spine Imaging deliberately chose to violate this law.

170.   The defendants were put on actual notice as early as 1933 that a lay corporation cannot contract with a learned medical profession. *See id.*

171.   Further, the defendants' conduct of disguising Central Medical as a "legitimate" medical clinic purportedly owned by a physician evidences a conscious awareness of the prohibition against the corporate practice of medicine.

172.   The defendants' knowing and intentional failure to abide by state law renders all resulting contracts void as a matter of law.

## VI.   CENTRAL MEDICAL WAS FRAUDULENTLY CREATED BY BULLON TO FURTHER A "PATIENT LAUNDERING" SCHEME

### A.   THE "PATIENT LAUNDERING" SCHEME

173.   Bullon and Mendez created Spine Imaging for the purpose of performing as many MRI scans as possible, regardless of medical necessity.

174.   Central Medical was created by Bullon to further this purpose by enabling the defendants' "patient laundering" scheme.

175.   Bullon and Mendez recognized that their business model would be unsuccessful if patient referrals were generated solely by chiropractors.

176.   Bullon knew that chiropractor-generated MRI referrals were scrutinized and questioned by insurers more closely than referrals generated by licensed physicians.

177.   Therefore, the defendants created Central Medical as an intermediary to

27

evade such scrutiny.

178.    Specifically, Central Medical allowed the defendants to generate most of their MRI referrals from a physician (i.e., Magana/Morales).

179.    Spine Imaging could not have performed such a high volume of MRI scans without first "laundering" patient referrals through Central Medical.

180.    Compared to Spine Imaging, Central Medical generated relatively small revenue.  For example, a typical Central Medical patient was charged for an initial consultation (CPT Code 99244), at a cost to Allstate of $325.00.

181.    Some patients also received follow-up consultations (CPT Code 99214) at a cost to Allstate of $150.00 per consultation.

182.    An overwhelming majority (i.e., 96%) of Central Medical's patients were referred to Spine Imaging.

183.    Spine Imaging billed Allstate $1,650.00 for each MRI scan performed. Most Spine Imaging patients received multiple MRI scans.

184.    The defendants intentionally engaged in this fraudulent conduct with the expectation that insurers would pay for the expensive MRI testing in the prompt manner required by Minnesota law.

185.    Despite its due diligence, Allstate did not uncover defendants' scheme because of the defendants' painstaking efforts to fabricate an appearance of legitimacy concerning Central Medical.

186.    This scam could not have been so successful but for the fraudulent incorporation of Central Medical, discussed in Section V(C), *supra*, at paragraphs 136

through 144.

**B.   CENTRAL MEDICAL ACCOUNTS FOR MORE THAN 80% OF SPINE IMAGING'S PATIENT REFERRALS**

187.   Spine Imaging claims that its clientele is comprised primarily of patients with neck and spine injuries incurred in motor vehicle accidents.

188.   Spine Imaging also claims that its business model relies on patient referrals from chiropractors in the Twin Cities metropolitan area who are actively treating patients involved in motor vehicle accidents.

189.   Despite these claims, however, over 80% of Spine Imaging's business is derived from patients funneled to it by Central Medical, which is not a chiropractic office.

190.   Since its inception in November of 2007, Central Medical has treated 129 Allstate claimants.  These claimants are listed in the chart annexed hereto as Exhibit 3.

191.   During the same time period, Spine Imaging treated 149 Allstate claimants. These claimants are listed in the chart annexed hereto as Exhibit 4.

192.   Of these claimants, 124 were treated at both Central Medical and Spine Imaging.  These claimants are listed in the chart annexed hereto as Exhibit 5.

193.   In total, 83% (i.e., 124 of 149) of Allstate claimants who received MRI scans at Spine Imaging were referred by Central Medical.

194.   More troubling, Morales referred 96% (i.e., 124 of 129) of Allstate claimants he purportedly treated at Central Medical to Spine Imaging for MRIs.

195.   Bullon's marketing efforts have been successful in attracting patient

referrals from chiropractic offices.

196.    To achieve this success, Bullon hired Castro to market Central Medical and Spine Imaging's services, and recruit referring chiropractors.

197.    Castro offers chiropractors kickbacks for their patient referrals.

198.    As evidenced by the above data, Bullon instructs chiropractors to refer patients to Central Medical, not Spine Imaging.

199.    This is further supported by a chiropractor's referral that stated he was "referring his patient to Central Medical for MRIs at Spinal imaging."

200.    Bullon's request for intermediate referrals to Central Medical allows the defendants to "launder" the patient referral (i.e., to (1) create the appearance that the referral is generated by a physician and not a chiropractor; and (2) deliberately conceal the fact that the referrals are not medically necessary).

201.    These intermediate referrals also allow the defendants to collect additional revenue through Central Medical's intermediate (and wholly unnecessary) evaluation and referral of patients to Spine Imaging.

### C.    CENTRAL MEDICAL'S PATIENTS ARE UNAWARE THEY ARE BEING LAUNDERED THROUGH AN INTERMEDIARY

202.    Central Medical and Spine Imaging have always acted as a single corporate entity under Bullon's dominion and control.

203.    Central Medical and Spine Imaging are located in adjoining offices in the same medical office building.

204.    Patients are not informed that they are being referred to another medical

facility during their initial patient examinations.

205.    Rather, an employee simply escorts each patient to Spine Imaging's office suite for the MRIs.

206.    Bullon's has exclusive dominion and control over all personnel decisions for both Spine Imaging and Central Medical.  In one instance, Bullon hired an employee to work at Spine Imaging.  During this employee's first week of employment, Bullon reassigned him to Central Medical's billing office where he worked for approximately four months.  Thereafter, Bullon once again reassigned him back to Spine Imaging where he worked until he left

207.    With Bullon controlling both facilities, patients are unaware that they have unwittingly become victims of the defendants' "patient laundering" scheme.

## VII.   UNNECESSARY, UNJUSTIFIED AND UNWARRANTED MEDICAL TREATMENT

208.    The defendants' "patient laundering" scheme resulted in numerous charges for treatment that were not medically justified or compensable under the Minnesota No-Fault Insurance Act.

209.    The defendants' scheme to defraud Allstate was predicated on the fabrication of medical records, bills, invoices, HICFs, and other insurance claim documents seeking payment for medical treatment which was worthless, unwarranted, unjustified and unnecessary.

210.    This scheme resulted in unnecessary treatment and testing originating from both Central Medical and Spine Imaging.

A.    **WORTHLESS RADIOLOGIC STUDIES AT SPINE IMAGING**

211.    The defendants' scheme included billing for unnecessary MRI scans.

212.    Generally, subjective soft tissue injuries should be treated through conservative pain management including chiropractic adjustments, acupuncture, massage therapy, and other physical modalities.

213.    At the onset of soft tissue injuries, an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries including radiculopathy (severe back pain radiating into an extremity), or the patient has a medical history where their clinical presentation raises concern for a disease process that might be unrelated to trauma such as neoplasm.

214.    Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

215.    As is the case with most soft tissue injuries including back sprains/strains, conservative treatment and the passage of time will typically alleviate the discomfort caused by a trauma within three months. *See* MINN. R. 5221.6200 (subp. 3)(A) ("the use of passive treatment modalities in a clinical setting . . . is not indicated beyond 12 calendar weeks after any of the passive modalities . . . are initiated").

216.    If a patient's prognosis does not improve after three months of conservative treatment, the patient may be suffering from a more serious problem that would require more aggressive treatment such as steroid injections and/or surgeries. Only then should a treating physician or chiropractor consider an MRI referral to aid in the diagnosis of spinal abnormalities.

217.   Most – if not all – Allstate claimants who received MRI scans at Spine
Imaging were not inflicted by these more serious medical conditions.

218.   This is evidenced by the fact that Morales does not alter his diagnoses,
treatment plans, or recommendations after Spine Imaging performs an MRI.

219.   Instead, Morales uniformly instructs his patients to continue with
conservative chiropractic care.

220.   Morales does not recommend more aggressive treatment.

221.   Morales' patients are not surgical candidates.

222.   The unchanged treatment plans all support the chiropractor and Morales'
initial diagnosis of subjective soft tissue pain – the same diagnosis made prior to the
provision of unnecessary and costly MRI scans.

223.   Morales often fabricated false justifications for his MRI referrals.

224.   On numerous occasions, Morales referred patients to Spine Imaging with a
suspicion of facet joint mediated pain.  An example of this type of MRI referral is
annexed herewith as Exhibit 6.

225.   Facet joint mediated pain is a form of arthritis where a patient suffers joint
pain in the spine.

226.   An MRI referral for this purpose is not appropriate because an MRI will not
adequately visualize pain.

227.   Other diagnostic studies such as CT scans, x-rays and ultrasounds are better
suited to visualize facet joint mediated pain.

228.   In these instances, there are no objective symptoms listed in Morales'

medical records that support a suspicion of facet joint mediated pain.

229.    There are similarly no findings in Ford's MRI reports to support this
diagnosis.

230.    Morales does not recommend any treatment or alter the treatment plans in
any manner that would help alleviate pain in the facet joint.

231.    Again, Morales simply orders ongoing conservative chiropractic treatment.

232.    Spine Imaging's MRIs were often performed within days of a motor
vehicle accident, despite a dearth of objective neurological symptoms warranting
immediate radiologic studies.

233.    Spine Imaging often performed multiple MRIs on multiple areas of a
patient's spine.

234.    Multiple MRIs are typically medically unnecessary even if there were
objective neurological symptoms warranting an MRI because these symptoms would
often pinpoint a spinal abnormality centralized in a particular area of a patient's spine.

235.    At times, patients who were reluctant to have an MRI were coerced into
having the test by Morales and/or other Bullon employees.

236.    Spine Imaging misrepresented the necessity of these MRIs through
fabricated medical records, bills, invoices, HICFs, and other insurance claims
documentation sent to Allstate through the U.S. Mail, together with a demand that
Allstate pay promptly for these worthless MRIs.  These documents fraudulently
represented that the MRI scans were medically justified and compensable under the
Minnesota No-Fault Insurance Act.

237. Spine Imaging generally billed Allstate for multiple MRIs performed on each claimant. In connection with the patients identified in the charts annexed hereto as Exhibit 7 (MRIs of the lumbar spine), Exhibit 8 (MRIs of the cervical spine), Exhibit 9 (MRIs of the thoracic spine) and Exhibit 10 (other MRIs), Allstate paid defendants for the fraudulent MRIs.

## B. UPCODING AT CENTRAL MEDICAL

238. Since Central Medical is nothing more than a "sham" entity, which sole existence was to provide a referral to Spine Imaging for an MRI scan, there is no medical justification for any of the treatment provided at Central Medical.

239. Central Medical's practice primarily focuses on patients injured in motor vehicle accidents. In most instances, these patients were referred to Central Medical from chiropractors who have already examined the patient, diagnosed injuries, and prepared a patient's treatment plan.

240. Upon presentation at Central Medical, Morales purportedly performed a brief examination of each patient.

241. There is no indication in Central Medical's medical records that Morales reviewed a referring chiropractor's records to consider the chiropractor's findings when conducting his own medical analysis.

242. Similarly, there is no indication that Morales reviewed x-rays and other radiologic studies previously performed on a patient to (among other things) avoid duplication and the need for other more costly radiologic studies.

243. Indeed, Central Medical was not providing a true medical evaluation of the

35

patient but rather fulfilling its role in the defendants' scheme by making the "necessary" referral to Spine Imaging.

244.    Central Medical routinely billed Allstate CPT Code 99244 for an initial patient consultation and/or examination.

245.    The criteria developed by the American Medical Association ("AMA") to properly assign a CPT Code to medical billing invoices include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION-MAKING | FACE TO FACE TIME |
|---|---|---|---|---|
| 99241 | Problem-Focused | Problem-Focused | Straightforward | 15 Minutes |
| 99242 | Expanded Problem-Focused | Expanded Problem-Focused | Straightforward | 30 Minutes |
| 99243 | Detailed | Detailed | Low Complexity | 40 Minutes |
| 99244 | Comprehensive | Comprehensive | Moderate Complexity | 60 Minutes |
| 99245 | Comprehensive | Comprehensive | High Complexity | 80 Minutes |

246.    If a patient presents for a re-evaluation, Central Medical routinely bills Allstate for CPT Code 99214.

247.    The criteria developed by the AMA to properly assign a CPT Code to medical billing invoices include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION-MAKING | FACE TO FACE TIME |
|---|---|---|---|---|
| 99211 | May not require the presence of a physician. | | | 5 Minutes |
| 99212 | Problem-Focused | Problem Focused | Straightforward | 10 Minutes |
| 99213 | Expanded Problem-Focused | Expanded Problem-Focused | Low Complexity | 15 Minutes |
| 99214 | Detailed | Detailed | Moderate | 25 Minutes |
| 99215 | Comprehensive | Comprehensive | High Complexity | 40 Minutes |

248.    The factors considered to determine the "complexity" of medical decision

making in arriving at a proper CPT Code assignment include:

| Type of Decision Making | Number of Diagnoses/Management Option | Amount and/or Complexity of Data Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| **Straightforward** (CPT Codes 99241, 99242 and 99212) | Minimal | Minimal/None | Minimal |
| **Low** (CPT Codes 99243 and 99213) | Limited | Limited | Low |
| **Moderate** (CPT Codes 99244 and 99214) | Multiple | Moderate | Moderate |
| **High** (CPT Codes 99245 and 99215) | Extensive | Extensive | High |

249.   To justify a medical bill demanding payment for CPT Code 99244, the injury/condition would necessarily require: (1) a moderate risk of mortality, morbidity and/or complications; (2) moderate diagnoses and review of complex data; (3) a comprehensive examination; and (4) face to face interaction of approximately 60 minutes.

250.   To justify a medical bill demanding payment for CPT Code 99214, the injury/condition would necessarily require: (1) a moderate risk of mortality, morbidity and/or complications; (2) moderate diagnoses and reviews of complex data; (3) a detailed examination; and (4) face to face interaction of approximately 25 minutes.

251.   Morales' examinations do not meet any of these requirements.

252.   Morales' consultations usually last about five (5) minutes before the patient

is ushered to Spine Imaging for an MRI.

253. In one instance, Morales patient "detailed" examination revealed only the following findings: "Patient Examination: Revealed a male." This record is annexed herewith as Exhibit 11.

254. Aside from a referral to Spine Imaging, Morales typical prescribes non-narcotic medications (i.e., Aspirin).

255. Morales' medical reports (a required formality) often contained numerous misrepresentations regarding a patient's history.

256. In several instances, Morales listed the wrong referring doctor.

257. In one case, Morales misrepresented that the "[p]atient . . . was the driver of a vehicle and was rear ended by another vehicle. Patient apparently hit the steering wheel." This patient was actually operating a bicycle at the time of the purported accident.

258. In the same report, which purportedly summarized the treatment of a mute patient, Morales misrepresented that the patient lacked "dysphonia" (disorders of the voice) and "dysarthria" (neurological motor speech disorder). This record is annexed hereto as Exhibit 12.

259. These misrepresentations conceal the lack of detailed/comprehensive exam required by level-4 patient examinations.

260. Morales' medical decision making is not of "moderate complexity."

261. Referrals to Spine Imaging for MRIs are predetermined before Morales even examines a patient.

38

262.    Central Medical's patients certainly are not risking morbidity or mortality from the soft-tissue injuries that Morales and his co-conspirators purport to specialize in at Central Medical.

263.    Moreover, there is no indication that the MRI results are used by Morales to render a diagnosis or alter patient treatment.

264.    Rather, Morales' diagnoses typically mirror the referring chiropractor's initial diagnosis, and Morales inevitably instructs the patients to continue with chiropractic care (thus insuring happy chiropractor referrers).

265.    Central Medical's billing department personnel is trained to automatically enter these codes, regardless of the complexity, detail and duration of the examination.

266.    Even if Central Medical billed for the most basic examinations (i.e., CPT Codes 99211 and 99241), the treatment was still unnecessary given the fact that Central Medical is nothing more than a medical mill providing unwarranted patient referrals to Spine Imaging.

267.    Based on the defendants' failure to meet the criteria set forth in CPT Code 99244 (office consultation), the defendants fraudulently billed Allstate for each of the patients identified in the chart annexed hereto as Exhibit 13.

268.    Based on the defendant's failure to meet the criteria set forth in CPT Code 99214 (office or other outpatient visit for the evaluation and management of an established patient), the defendants fraudulently billed Allstate for each of the patients identified in the chart annexed hereto as Exhibit 14.

269.    Central Medical's bills, invoices, and HICFs containing these

misrepresentations were forwarded to Allstate through the U.S. Mail, demand payment.

## VIII. RACKETEERING ACTIVITY: MAIL FRAUD

270. The defendants created, prepared and submitted false medical documentation, and intentionally violated the laws of the United States by forwarding documents containing fraudulent misrepresentations of fact with the intent of defrauding Allstate of its money and property, through the U.S. Mail.

271. The defendants placed or caused to be placed in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. §1341 (mail fraud) for the purpose of executing and/or attempting such fraudulent schemes.

272. Unless otherwise pled to the contrary, all documents, notes, reports, HICFs, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

273. Every automobile insurance claim detailed within involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

274. The defendants either personally used the mails to further their fraudulent scheme by causing fraudulent medical bills and records to be mailed to Allstate and/or

counsel for claimants and/or acted with knowledge that the use of the mails would follow in the ordinary course of business.

275.    The defendants knew that their office, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider or the plaintiffs would use the mails in connection with each of the fraudulent claims, including issuing payments based upon defendants' fraudulent documentation.

276.    Allstate estimates that the defendants' fraudulent medical billing scheme generated hundreds of mailings including, without limitation, those mailings listed in the chart annexed hereto as Exhibit 15. All documents referring or relating to the billings that were mailed to/from the defendants or Allstate in Exhibit 15 were mailed, or it was reasonably foreseeable that they would be mailed.

## IX.    **FRAUDULENT CONCEALMENT**

277.    The nature of the defendants' fraudulent scheme was self-concealing by its very nature – false medical reports and false invoices appearing legitimate on their face.

278.    Based on the defendants' concerted efforts to conceal the harmful conduct, the defendants' fraudulent scheme went undetected until Allstate had sustained substantial financial injury.

279.    Despite due diligence, Allstate did not discover the true nature and scope of the medical billing fraud scheme until 2010.

280.    The defendants were able to successfully conceal their fraudulent activity by: (1) establishing separate corporate entities to hide the close relationship between Central Medical and Spine Imaging and by Bullon; (2) periodically changing the names

41

of these corporate entities; and (3) representing through mailings that the medical treatment was necessary.

281.   The defendants' ability to conceal the fraudulent scheme was enhanced by the position of trust medical providers are typically accorded in the transaction of medical insurance claims.

282.   Allstate relied to its detriment upon the presumption of honesty accorded the medical documentation submitted by the defendants.

283.   Moreover, Allstate was required by Minnesota law to promptly reimburse a medical service provider within thirty days.

284.   Nothing on the face of defendants' medical records – submitted in connection with each discrete insurance claim – would have led a prudent person to believe that the medical treatment was unnecessary, or that the purported medical services were provided by entities operated in violation of Minnesota law.

285.   Had Allstate not been misled by defendants' fraudulent conduct and intentionally false statements, payments would not have been made on these claims.

286.   Only recently did Allstate become aware of the specifics of the defendants' ongoing fraudulent scheme.

287.   This was due, in part, to Spine Imaging filing a lawsuit against Allstate, alleging that payments were due on unpaid MRIs.[1]

288.   Spine Imaging's lawsuit is indicative of the lengths Bullon will go to

---

[1] *Spine Imaging MRI, LLC v. Liberty Mutual, et. al.*, United States District Court for the District of Minnesota, Docket No. 0:09-cv-1963-QRT-AJB.

42

conceal the fraudulent nature of his business enterprises.

289.    The allegations in Spine Imaging's complaint, which were represented to this Court as being true and accurate, further portray a legitimate business engaged in a lawful medical practice.

290.    The lawsuit avers that Allstate, and other insurers, have improperly withheld No-Fault benefits for necessary medical treatment received by its insureds, thus continuing to perpetuate the misrepresentations that their MRIs were medically justified.

291.    The lawsuit conveniently omits any reference to Central Medical.

292.    At the time Bullon filed his lawsuit, Allstate had been paying for MRIs.

293.    In defense of the lawsuit, Allstate initiated a global investigation.

294.    Allstate's investigation included the review of claims files and data, which revealed the global pattern of fraud, discussed above.

295.    Allstate's investigation also included interviews of former employees and business associates.

296.    This investigation revealed the defendants' "patient laundering" scheme, and a global pattern of providing unnecessary, unjustified and/or worthless medical services, including unjustified MRI scans.

297.    Each HICF submitted by defendants to plaintiffs warranted (albeit falsely) that the treatment was necessary.  These HICFs containing the specific information, dates, and other information are in the defendants' possession, custody and control.

298.    Allstate's investigation is ongoing and new facts concerning the defendants' scheme continue to be revealed.

## X. DAMAGES

299.   The pattern of fraudulent conduct by the defendants injured Allstate in its

business and property by reason of the aforesaid violations of state and federal law.

Although it is not necessary for Allstate to calculate damages with specificity at this stage

in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but

is not limited to, compensatory damages for:

(1)   payments in connection with first-party claims of $1,071,609.80, the exact amount to be determined at trial. The tables annexed hereto as Exhibit 16, Exhibit 17 and Exhibit 18, and incorporated herein as if set forth in their entirety, identify Allstate's payments to defendants in connection with first-party claims determined to be fraudulent as of the filing of this Complaint. Exhibit 16 identifies payments made to Central Medical (including payments made to Central Neurology Clinic, LLC under the same tax identification number). Exhibit 17 identifies payments made to Spine Imaging. Exhibit 18 indentifies payments made to Advanced Imaging.

(2)   expenses incurred to review, adjust, investigate, litigate and pay the false and fraudulent claims created by the defendants and supported defendants' operation of enterprises through a pattern of illegal activity.

## XI. CAUSES OF ACTION

### COUNT 1
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
#### (Against Eduardo Bullon, Rafael Mendez, William J. Ford, III, M.D., Jorge Bullon, Naida Hernandez Gonzales, Central Neurology Clinic, LLC, Central Medical Clinic, LLC – Clinica Central, Alfonso Morales-Utrilla, M.D., and Hans Castro, D.C.)

300.   Allstate realleges, repleads and incorporates by reference all paragraphs set

forth above as if fully set forth herein.

301.   The Count I defendants intentionally caused to be prepared and mailed false

medical documentation in connection with Allstate insurance claims, in furtherance of

their scheme to defraud.

302.   The Count I defendants employed numerous mailings (see Exhibit 15) to demand and/or receive payment.

303.   Among other things, medical billing invoices, medical reports, applications for insurance and premium checks were routinely delivered to Allstate through the U.S. Mail. Policies of insurance were delivered to patients through the U.S. Mail. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail. *See* Exhibit 15.

304.   As documented above, the Count I defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were excessive, were not reasonable, were not necessary, and/or were of little to no therapeutic value to the patients, to collect payment from Allstate under the Minnesota No-Fault Insurance Act.

305.   As a result of and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by their agents and employees, issued payments to the defendants that would not otherwise have been paid.

306.   Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time enabling them to continue without being detected.

307.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

308.   By filing numerous fraudulent claims in an ongoing scheme, the Count I

45

defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

309.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to defendants for the benefit of the Count I defendants.

310.   Allstate is in the business of writing insurance and paying claims in the State of Minnesota.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

311.   Spine Imaging MRI, LLC constitutes an enterprise engaged in, and the activities of which, affect interstate commerce.

312.   The Count I defendants associated with the foregoing enterprise and participated both directly and indirectly, in its conduct through a pattern of racketeering activities.

313.   Allstate is a "person" as defined by 18 U.S.C. §1961(3), injured in its business or property by reason of defendants' conduct.

314.   The Count I defendants' conduct in violation of 18 U.S.C. §1962(c) was the direct and proximate cause of Allstate's injury.

315.   By virtue of the Count I defendants' violations of 18 U.S.C. §1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
**(Against Eduardo Bullon, Rafael Mendez, William J. Ford, III, M.D.,
Jorge Bullon, Naida Hernandez Gonzales, Central Neurology Clinic, LLC,
Central Medical Clinic, LLC – Clinica Central, Alfonso Morales-Utrilla, M.D., and
Hans Castro, D.C.)**

316.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

317.    The Count II defendants intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

318.    The Count II defendants employed numerous mailings (see Exhibit 15) to demand and/or receive payment.

319.    Among other things, medical billing invoices, medical reports, applications for insurance and premium checks were routinely delivered to Allstate through the U.S. Mail.  Policies of insurance were delivered to patients through the U.S. Mail.  Medical reports and invoices were delivered to Allstate through the U.S. Mail.  Payments to defendants traveled via the U.S. Mail.  *See* Exhibit 15.

320.    As documented above, the Count II defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were excessive, were not reasonable, were not necessary, and/or were of little to no therapeutic value to the patients, to collect payment from Allstate under the Minnesota No-Fault Insurance Act.

321.    As a result of and in reasonable reliance upon these misleading documents

and misrepresentations, Allstate, by their agents and employees, issued payments to the defendants that would not otherwise have been paid.

322.   Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time enabling them to continue without being detected.

323.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

324.   By filing numerous fraudulent claims in an ongoing scheme, the Count II defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

325.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to defendants for the benefit of the Count II defendants.

326.   Allstate is in the business of writing insurance and paying claims in the State of Minnesota.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

327.   Advanced Imaging MRI of Minnesota, LLC constitutes an enterprise engaged in, and the activities of which, affect interstate commerce.

328.   The Count II defendants associated with the foregoing enterprise and participated both directly and indirectly, in its conduct through a pattern of racketeering activities.

329.   Allstate is a "person" as defined by 18 U.S.C. §1961(3), injured in its

48

business or property by reason of defendants' conduct.

330. The Count II defendants' conduct in violation of 18 U.S.C. §1962(c) was the direct and proximate cause of Allstate's injury.

331. By virtue of the Count II defendants' violations of 18 U.S.C. §1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
(Eduardo Bullon, Spine Imaging MRI, LLC, Jorge Bullon,
Naida Hernandez Gonzales, Alfonso Morales-Utrilla, M.D., and Hans Castro, D.C.)

332. Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

333. The Count III defendants intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

334. The Count III defendants employed numerous mailings (see Exhibit 15) to demand and/or receive payment.

335. Among other things, medical billing invoices, medical reports, applications for insurance and premium checks were routinely delivered to Allstate through the U.S. Mail. Policies of insurance were delivered to patients through the U.S. Mail. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail. *See* Exhibit 15.

336. As documented above, the Count III defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were excessive, were not reasonable, were not necessary, and/or were of little to no therapeutic value to the patients, to collect payment from Allstate under the Minnesota No-Fault Insurance Act.

337. As a result of and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by their agents and employees, issued payments to the defendants that would not otherwise have been paid.

338. Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time enabling them to continue without being detected.

339. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

340. By filing numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

341. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to defendants for the benefit of the Count III defendants.

342. Allstate is in the business of writing insurance and paying claims in the State of Minnesota. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

50

343.    Central Medical Clinic, LLC – Clinica Central constitutes an enterprise engaged in, and the activities of which, affect interstate commerce.

344.    The Count III defendants associated with the foregoing enterprise and participated both directly and indirectly, in its conduct through a pattern of racketeering activities.

345.    Allstate is a "person" as defined by 18 U.S.C. §1961(3), injured in its business or property by reason of defendants' conduct.

346.    The Count III defendants' conduct in violation of 18 U.S.C. §1962(c) was the direct and proximate cause of Allstate's injury.

347.    By virtue of the Count III defendants' violations of 18 U.S.C. §1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Against Eduardo Bullon, Rafael Mendez, Advanced Imaging MRI of Minnesota,**
**LLC, Spine Imaging MRI, LLC, Jorge Bullon Naida Hernandez Gonzales,**
**Alfonso Morales-Utrilla, M.D., and Hans Castro, D.C.)**

348.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

349.    The Count IV defendants intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

51

350.    The Count IV defendants employed numerous mailings (see Exhibit 15) to demand and/or receive payment.

351.    Among other things, medical billing invoices, medical reports, applications for insurance and premium checks were routinely delivered to Allstate through the U.S. Mail. Policies of insurance were delivered to patients through the U.S. Mail. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail. *See* Exhibit 15.

352.    As documented above, the Count IV defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were excessive, were not reasonable, were not necessary, and/or were of little to no therapeutic value to the patients, to collect payment from Allstate under the Minnesota No-Fault Insurance Act.

353.    As a result of and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by their agents and employees, issued payments to the defendants that would not otherwise have been paid.

354.    Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time enabling them to continue without being detected.

355.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

356.    By filing numerous fraudulent claims in an ongoing scheme, the Count IV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C.

§1962(c).

357.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to defendants for the benefit of the Count IV defendants.

358.    Allstate is in the business of writing insurance and paying claims in the State of Minnesota.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

359.    Central Neurology Clinic, LLC constitutes an enterprise engaged in, and the activities of which, affect interstate commerce.

360.    The Count IV defendants associated with the foregoing enterprise and participated both directly and indirectly, in its conduct through a pattern of racketeering activities.

361.    Allstate is a "person" as defined by 18 U.S.C. §1961(3), injured in its business or property by reason of defendants' conduct.

362.    The Count IV defendants' conduct in violation of 18 U.S.C. §1962(c) was the direct and proximate cause of Allstate's injury.

363.    By virtue of the Count IV defendants' violations of 18 U.S.C. §1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## CONSPIRACY UNDER 18 U.S.C. § 1962(d)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against All Defendants)

364.   Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

365.   The defendants conspired with one another to violate 18 U.S.C. §1962(c) and thereby violated 18 U.S.C. §1962(d).

366.   As a result of this conspiratorial conduct, Allstate has been injured in its business and property.

367.   By virtue of the defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE
### (Against Spine Imaging MRI, LLC)

368.   Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

369.   Spine Imaging MRI is a limited liability company incorporated under the laws of the State of Minnesota.

370.   Spine Imaging engages in the corporate practice of medicine as it is owned, operated and controlled by non-licensed laypersons Bullon and/or Mendez.

371.   Spine Imaging engages the services of Ford, a radiologist licensed by the

54

Minnesota Board of Medical Practice.

372.    Ford engages in the "practice of healing" by engaging in, or holding out to the public as being engaged in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments.

373.    Ford underwent significant training and education to become a radiologist.

374.    Ford should enjoy unfettered independent medical judgment, however, he is subordinate to Bullon, a layperson.

375.    Spine Imaging submits bills to Allstate and is paid for the healing services provided by Ford.

376.    Spine Imaging pays Ford for his services.

377.    Spine Imaging's unlawful corporate status is part of a fraudulent scheme that resulted in Allstate being defrauded of over one million dollars.

378.    Spine Imaging's history of litigation suggests it was cognizant of the Corporate Practice of Medicine Doctrine as early as 2002.

379.    Spine Imaging's actions, therefore, evidence a knowing and intentional failure to abide by state law.

## COUNT VII
### UNLAWFUL CORPORATE PRACTICE OF MEDICINE
### (Against Advanced Imaging MRI of Minnesota, LLC)

380.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

381.    Advanced Imaging MRI of Minnesota was a limited liability company incorporated under the laws of the State of Minnesota.

382.    Advanced Imaging MRI of Minnesota engaged in the corporate practice of medicine as it was owned, operated and controlled by non-licensed laypersons Bullon and/or Mendez.

383.    Advanced Imaging MRI of Minnesota engaged the services of Ford, a radiologist licensed by the Minnesota Board of Medical Practice.

384.    Ford engages in the "practice of healing" by engaging in, or holding out to the public as being engaged in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments.

385.    Ford underwent significant training and education to become a radiologist.

386.    Ford should enjoy unfettered independent medical judgment, however, he is subordinate to Bullon, a layperson.

387.    Upon information and belief, Advanced Imaging MRI of Minnesota also engaged the services of other radiologists, chiropractors and other medical professionals who engaged in the practice of healing, underwent significant training and education and enjoyed unfettered independent medical judgment.

388.    Advanced Imaging MRI of Minnesota submitted bills to Allstate and is paid for the healing services provided by Ford and/or other medical providers.

389.    Advanced Imaging MRI of Minnesota paid Ford and/or other medical professionals for their services.

390.    Advanced Imaging MRI of Minnesota's unlawful corporate status is part of a fraudulent scheme that resulted in Allstate being defrauded of over one million dollars.

391.    Advanced Imaging's history of litigation suggests that it was cognizant of

the Corporate Practice of Medicine Doctrine as early as 2002.

392.    Advanced Imaging MRI of Minnesota's actions, therefore, evidence a knowing and intentional failure to abide by state law.

## COUNT VIII
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE
### (Against Central Medical Clinic, LLC – Clinica Central)

393.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

394.    Central Medical is a "sham" corporation created by Bullon for the sole purpose of perpetrating the defendants' scheme to defraud Allstate.

395.    Central Medical is an adjunct to Spine Imaging. It shares office space, employees, operational control and actual ownership by Bullon, a non-licensed layperson.

396.    Morales' actual position at Central Medical is that of an employee. He was recruited and hired by Bullon; he reports directly to Bullon; he is supervised by Bullon and Gonzales; and when it appeared as though Bullon would be unable to continue the scheme to defraud Allstate when Magana's medical license was indefinitely suspended, Bullon recruited Morales to take over the Central Medical practice. Morales exerts no independent business judgment and does not evidence any indicia of ownership of Central Medical.

397.    Morales' duty to his corporate owner Bullon trumps the professional duty owed to his patients.

398.    Morales is a physician licensed by the Minnesota Board of Medical

Practice. Morales engages in the "practice of healing" by engaging in, or holding out to the public as being engaged in, the diagnosis, analysis, treatment, correction and cure of physical injuries and ailments.

399.    Morales underwent significant training and education.

400.    Morales should enjoy unfettered independent medical judgment, however, he is subordinate to Bullon, a layperson.

401.    Central Medical's employees – also under the operation and control of Spine Imaging and Bullon – submit bills to Allstate for the healing services provided by Morales.

402.    Central Medical compensates Morales for his services.

403.    Central Medical's unlawful corporate status is part of a fraudulent scheme that resulted in Allstate being defrauded of over one million dollars.

404.    Moreover, the defendants actively sought to conceal Central Medical's true ownership.

405.    Central Medical's actions, therefore, evidence a knowing and intentional failure to abide by state law.

**COUNT IX**
**UNLAWFUL CORPORATE PRACTICE OF MEDICINE**
**(Against Central Neurology Clinic, LLC)**

406.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

407.    Central Neurology Clinic, LLC was a "sham" corporation created by Bullon for the sole purpose of perpetrating the defendants' scheme to defraud Allstate.

58

408.    Central Neurology Clinic, LLC was an adjunct to Spine Imaging.  It shares office space, employees, operational control and actual ownership by Bullon, a non-licensed layperson.

.409.    Bullon recruited and hired medical doctors including, but not limited to Morales and Magana who reported directly to Bullon and was supervised by Bullon and/or Gonzales.  The medical doctors exerted no independent business judgment and did not evidence any indicia of ownership of Central Neurology Clinic, LLC.

410.    The medical doctors' duty to their corporate owner Bullon trumped the professional duty owed to their patients.

411.    The medical doctors hired by Bullon, including, but not limited to Morales and Magana, were engaged in the practice of healing, underwent significant training and education, and enjoyed unfettered independent medical judgment.

412.    Central Neurology Clinic, LLC's employees – also under the operation and control of Spine Imaging and Bullon – submitted bills to Allstate for their healing services.

413.    Central Neurology Clinic, LLC compensates these medical professionals for their services.

414.    Central Neurology Clinic, LLC's unlawful corporate status is part of a fraudulent scheme that resulted in Allstate being defrauded of over one million dollars.

415.    Moreover, the defendants actively sought to conceal Central Neurology Clinic's true ownership.

416.    Central Neurology Clinic, LLC's actions, therefore, evidence a knowing

and intentional failure to abide by state law.

## COUNT X
## COMMON LAW FRAUD
### (Against All Defendants)

417.   Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

418.   The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under Minnesota law.  This included, but is not limited to material misrepresentations contained in the defendants' medical reports, invoices, HICFs and insurance claim documentation which (1) materially misrepresented the ownership structure of Central Medical and Spine Imaging; and (2) materially misrepresented the medical necessity of treatment provided to patients/Allstate claimants.

419.   The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

420.   The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate.

421.   The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not compensable under the Minnesota No-Fault Insurance Act.

422.   Allstate reasonably relied upon such material misrepresentations in paying for medical expenses which are not compensable under the Minnesota No-Fault Insurance Act.

423.   Allstate's damages include, but are not limited to (1) monies paid for medical expenses and services which were unnecessary, unwarranted and/or excessive; (2) monies paid in reasonable reliance on defendants' representations regarding the corporate status of the medical and MRI facilities; and (3) reimbursement for the fair and reasonable value of the labor and resources expended to detect and expose the defendants' scheme to defraud Allstate.

## COUNT XI
### DISGORGEMENT UNDER MINN. STAT. ANN. § 65B.54
### MINNESOTA NO-FAULT INSURANCE ACT
**(Against Spine Imaging MRI, LLC, Advanced Imaging MRI of Minnesota, LLC, Central Medical Clinic, LLC – Clinica Central, Central Neurology Clinic, LLC Alfonso Morales-Utrilla, M.D., and William J. Ford, III, M.D.)**

424.   Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

425.   The Minnesota No-Fault Insurance Act was created, in part, to foster the prompt payment of all reasonable expenses for necessary medical care. Given the stringent time demands, the law affords an insurer a mechanism to recover erroneously paid No-Fault benefits.

426.   The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under Minnesota law. This included, but is not limited to material misrepresentations contained in the defendants' medical reports, invoices, HICFs and insurance claim documentation which (1) materially misrepresented the ownership structure of Central Medical and Spine Imaging; and (2) materially

misrepresented the medical necessity of treatment provided to patients/Allstate claimants.

427.   The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

428.   The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate.

429.   The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not compensable under the Minnesota No-Fault Insurance Act.

430.   Allstate reasonably relied upon such material misrepresentations in paying for medical expenses which were not compensable under the Minnesota No-Fault Insurance Act.

431.   Allstate is entitled to reimbursement of all payments made to the defendants that were made in reliance of the defendants' fraudulent misrepresentations.

## COUNT XII
### VIOLATIONS OF MINN. STAT. ANN. § 325F.69
### MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (Against All Defendants)

432.   Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

433.   The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under Minnesota law.  This included, but is not limited to material misrepresentations contained in the defendants' medical reports, invoices,

HICFs and insurance claim documentation which (1) materially misrepresented the ownership structure of Central Medical and Spine Imaging; and (2) materially misrepresented the medical necessity of treatment provided to patients/Allstate claimants.

434.   The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

435.   The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate.

436.   The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not compensable under the Minnesota No-Fault Insurance Act.

437.   Allstate reasonably relied upon such material misrepresentations in paying for medical expenses that were not compensable under the Minnesota No-Fault Insurance Act.

438.   Allstate's damages include, but are not limited to (1) monies paid for medical expenses and services which were unnecessary, unwarranted and/or excessive; (2) monies paid in reasonable reliance on defendants' representations regarding the corporate status of the medical and MRI facilities; and (3) reimbursement for the fair and reasonable value of the labor and resources expended to detect and expose the defendants' scheme to defraud Allstate.

439.   Allstate's insured drivers and the general public have all been similarly damaged, either directly or indirectly, by the actions of the defendants as set forth above. Specifically, the increased cost of medical care, unnecessary MRIs and investigations are

passed on to consumers through increased insurance premiums.

440.    MINN. STAT. ANN. § 8.31 (subd. 3a) provides Allstate with a private cause of action for the defendants' violations of the Minnesota Prevention of Consumer Fraud Act.  This cause of action allows for the recovery of damages, costs and attorneys fees. Allstate also seeks a permanent injunction prospectively preventing the defendants from perpetrating their insurance fraud scheme.

## COUNT XIII
## UNJUST ENRICHMENT
### (Against All Defendants)

441.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

442.    When Allstate paid the defendants, it reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

443.    Allstate's payments constitute a benefit which the defendants aggressively sought and knowingly accepted.

444.    The defendants all caused Central Medical and Spine Imaging to wrongfully obtain payments from Allstate through their fraudulent billing scheme as described more fully above.

445.    Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

## COUNT XIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## DECLARATORY JUDGMENT ACT
### (Against Spine Imaging MRI, LLC, Advanced Imaging MRI of Minnesota, LLC, Central Medical Clinic, LLC – Clinica Central, Central Neurology Clinic, LLC Alfonso Morales-Utrilla, M.D., and William J. Ford, III, M.D.)

446.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

447.    In view of Central Medical and Spine Imaging's illegal corporate structure, and/or illegal control by non-licensed laypersons, the Count XIV defendants were, at all relevant times, operating in violation of Minnesota law.

448.    The Count XIV defendants continue to submit claims for No-Fault benefits to the plaintiffs, and other claims remain pending with plaintiffs.

449.    The Count XIV defendants continue to challenge prior claim denials.

450.    The Count XIV defendants continue to commence litigation against Allstate seeking payment of No-Fault benefits for the unnecessary, unwarranted and unjustified medical treatment.

451.    A justifiable controversy exists between plaintiffs and the Count XIV defendants whereas the Count XIV defendants have challenged – and continue to challenge – Allstate's denials of such claims.

452.    Plaintiffs have no adequate remedy at law.

453.    The Count XIV defendants will continue to bill for No-Fault benefits absent a declaration by this Court that their activities are unlawful and that plaintiffs have no obligation to pay the pending, previously-denied and/or future No-Fault claims

submitted by any of the Count XIV defendants.

## COUNT XV
## INJUNCTIVE RELIEF
### (Against All Defendants)

454.    Allstate realleges, repleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

455.    For over a decade, defendants engaged in a pattern of fraudulent conduct to induce the plaintiffs into making payments by submitting bills and supporting medical records that contained (1) materially false and misleading information regarding the corporate structure of Central Medical and Spine Imaging, and/or (2) misrepresentations designed to conceal the fact that the evaluations, treatments and diagnostic testing were unwarranted, unnecessary, and performed – if at all – for the sole purpose of obtaining payment on fraudulent No-Fault claims.

456.    At the time the foregoing material misrepresentations were made by defendants, they were known by the defendants to be false.

457.    The defendants nevertheless submitted the claims for insurance benefits with the intent to deceive and defraud the plaintiffs, and to induce plaintiffs to pay fraudulent claims.

458.    Relying on defendants' misrepresentations, plaintiffs tendered payment on otherwise non-compensable No-Fault claims.

459.    The defendants, acting separately and in concert with each other, defrauded the plaintiffs, who are required to promptly process claims for No-Fault insurance benefits pursuant to Minnesota law.

66

460.    The defendants' conduct warrants the issuance of a permanent injunction requiring the defendants to cease further submission to plaintiffs of any and all bills seeking payment for any examinations, testing, treatment, MRI scans and referrals rendered to patients.

461.    The defendants' conduct warrants the issuance of a permanent injunction precluding the defendants from initiating any legal proceedings against the plaintiffs, including but not limited to, arbitration proceedings or lawsuits – in any forum or jurisdiction – seeking payment for, or equitable relief regarding, any examination, testing, treatment and referral rendered to patients.

462.    The defendants' conduct also warrants the issuance of a permanent injunction precluding Spine Imaging and Central Medical from engaging in the prohibited corporate practice of medicine.

463.    As a direct result of defendants' fraudulent conduct, the plaintiffs and the public suffered irreparable harm for which there exists no adequate remedy at law.

464.    In addition to the economic injury caused to Allstate's business and property, the defendants' practices have also injured the general public by requiring the motoring public to pay increased insurance premiums to off-set the financial injuries inflicted by insurance fraud schemes such as the defendants'.

465.    As the foregoing recitation of defendants' endeavors demonstrates, a balance of the equities favors granting the requested relief.  Specifically, denial of the relief sought will cause far greater harm to the plaintiffs than the granting of the relief will cause defendants.

466.    Granting the injunctive relief sought will foster plaintiffs' responsibility to combat fraud and will protect the plaintiffs' respective rights to legal and equitable remedies. Moreover, granting the injunctive relief will foster and protect the public interest in obtaining affordable healthcare, as well as in stemming the increase in the costs of insurance.

467.    Furthermore, granting the injunctive relief sought will serve the important purpose of denying the defendants further opportunity to (1) unjustly enrich themselves through the ill-gotten proceeds of their illegal activity; (2) capitalize on their fraud through accumulation of funds, assets, and property through the expenditure of proceeds obtained as a direct result of their illegal activity; and (3) infringe upon the plaintiffs' and the public's rights and interests.

468.    Based upon the foregoing, there is an immediate need for the injunctive relief requested by the plaintiffs.

## XII.   PRAYER FOR RELIEF

WHEREFORE, the plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Deerbrook Insurance Company, and Encompass Indemnity Company, respectfully pray that judgment enter in its favor, as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## CONSPIRACY UNDER 18 U.S.C. § 1962(d)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs

incurred in the detection of defendants' illegal conduct;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(d)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## UNLAWFUL CORPORATE PRACTICE OF MEDICINE

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(e)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT X**
**COMMON LAW FRAUD**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs

incurred in the detection of defendants' illegal conduct; and

(c)     GRANT any other relief this Court deems just.

**COUNT XI**
**DISGORGEMENT UNDER MINN. STAT. ANN. § 65B.54**
**MINNESOTA NO-FAULT INSURANCE ACT**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs

incurred in the detection of defendants' illegal conduct; and

(c)     GRANT any other relief this Court deems just.

**COUNT XII**
**VIOLATION OF MINN. STAT. ANN. § 325F.69**
**PREVENTION OF CONSUMER FRAUD ACT**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
## UNJUST ENRICHMENT

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate its costs, including but not limited to, investigative costs

incurred in the detection of defendants' illegal conduct; and

(c)   GRANT all other relief this Court deems just.

## COUNT XIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## DECLARATORY JUDGMENT ACT

(a)   DECLARE that the defendants are operating in violation of Minnesota's

prohibition against the corporate practice of medicine, and other applicable laws;

(b)   DECLARE that the defendants' activities are unlawful;

(c)   DECLARE that the plaintiffs have no obligation to pay pending, previously-

denied and/or future No-Fault insurance claims submitted by the defendants; and

(d)   GRANT all other relief this Court deems just.

## COUNT XV
## INJUNCTIVE RELIEF

(a)   ENJOIN defendants from submitting invoices to Allstate;

(b)   ENJOIN defendants from seeking payment, and/or pursuing any and all collection

action against Allstate on any allegedly outstanding No-Fault invoices;

(c)   ENJOIN defendants from initiating any legal proceedings against Allstate,

including but not limited to, arbitration proceedings or lawsuits – in any forum or

jurisdiction – seeking payment for, or equitable relief regarding any examination,

testing, treatment and referral purportedly rendered and/or provided to

patients/Allstate claimants; and

(d)     GRANT all other relief this Court deems just.


## XIII.  **JURY TRIAL DEMAND**

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate

Property and Casualty Insurance Company, Deerbrook Insurance Company, Encompass

Indemnity Company, and Northbrook Indemnity Company demand a trial by jury on all

claims.


Respectfully submitted,

Richard D. King, Jr. (pro hace vice pending)
rking@smithbrink.com
Nathan A. Tilden (pro hace vice pending)
ntilden@smithbrink.com
Joshua N. Garick (pro hace vice pending)
jgarick@smithbrink.com
SMITH & BRINK, P.C.
350 Granite Street, Suite 2303
Braintree, Massachusetts 02184
(617) 770-2214

and

Richard S. Stempel (#161834)
rick@stempellaw.com
John C. Syverson (#387068)
john@stempellaw.com
STEMPEL & DOTY, PLC
41 – 12th Avenue North
Hopkins, Minnesota 55343
(952) 935-0908

*Attorneys for Allstate Insurance Company,*
*Allstate Indemnity Company, Allstate Property*
*and Casualty Company, Deerbrook Insurance*
*Company, Encompass Indemnity Company and*
*Northbrook Indemnity Company*

Dated:  November *17*, 2010