# Exhibit 10

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
 3  ----------------------------------------------
 4  Spine Imaging MRI, L.L.C., a Minnesota
 5  limited liability company,
 6              Plaintiff,
 7
 8       vs.
 9
10  Liberty Mutual Fire Insurance Company, a
11  Wisconsin corporation, and Allstate
12  Insurance Company, an Illinois corporation,
13              Defendants,
14
15       and
16
17  Liberty Mutual Fire Insurance Company,
18              Third-Party Plaintiff,
19
20       vs.
21
22  Eduardo Bullon, individually; Rafael
23  Mendez, individually, Central Medical
24  Clinic, LLC; Dr. Alfonso Morales, M.D.,
25  individually; Northstar Radiology
```

1  Corporation, P.A.; Dr. William Ford,
2  M.D., individually and Dr. Hans Michael
3  Castro, D.C., individually,
4          Third-Party Defendants.
5  ------------------------------------------------------------
6
7
8
9
10
11         DEPOSITION OF ALFONSO MORALES, M.D.
12              Taken April 24, 2012
13            Commencing at 9:05 a.m.
14
15
16
17
18
19
20
21
22
23
24
25      REPORTED BY:   KELLEY E. ZILLES, RPR

1  Q. Okay. And what knowledge or understanding do
2  you have as MRI machines compare to one another, in
3  other words, a Fonar versus a Picker versus a Toshiba?
4  A. I think that's minutia, really. I mean, I think
5  it's minutia to look at every single type of scanner,
6  whether it's Toshiba or Siemens or GE. I think a
7  scanner, as long as you have a good resolution and you
8  can see the scans correctly, I think that's what I was
9  looking at.
10 Q. Okay. And you made reference to getting a
11 report of findings or an interpretation report done --
12 A. Yes.
13 Q. -- of the scan?
14 A. Yes.
15 Q. Okay. Is that one of the things you accept when
16 you refer a patient of yours to Spine Imaging?
17 A. To have an adequate interpretation and
18 professionally done, yes.
19 Q. Okay. Who do you expect that to come from?
20 A. At the time it was Dr. Ford, Dr. Johnson, there
21 was another doctor that I can't remember his name.
22 Q. Okay. Would you ever refer a patient of yours
23 to an MRI facility that did not provide a report of
24 findings?
25 A. No.

1   Q. That's a given, in other words?
2   A. Yes.
3   Q. Is that fair?
4   A. Yeah, you have to have that.
5   Q. Okay. And does that report of findings have to
6   come from a medical doctor who's a radiologist?
7   A. It has to be from a radiologist, yes.
8   Q. Okay. And so would it be fair to understand
9   then when you determined you were going to refer
10  patients of Central Medical to Spine Imaging that you
11  knew Dr. Ford and/or Dr. Johnson would be interpreting
12  those scans and you were satisfied they were competent
13  radiologists?
14  A. That is correct, yes.
15  Q. And you were in fact counting on that?
16  A. Yes.
17  Q. Did you have any concern about the ownership of
18  the MRI facilities you were referring patients of yours
19  to?
20  A. No, that was not my business.
21  Q. What use are you making of the MRI scans and the
22  report of findings issued to you by Spine Imaging?
23  A. What use?
24  Q. Yes.
25  A. It's important to know what is the anatomy and

 1        A.   I don't know what kind of relationship he has,
 2   no.
 3        Q.   Did you ever see any kind of contract or
 4   agreement between Spine Imaging and Dr. Ford?
 5        A.   No.
 6        Q.   I think you indicated earlier that to the extent
 7   that there were reports generated following some
 8   diagnostic testing done at Spine Imaging, that would
 9   come to you on Spine Imaging letterhead, is that
10   correct?
11        A.   Yes.
12        Q.   Would that report be signed by a physician or
13   some qualified person interpreting the, the results?
14        A.   Yes.
15        Q.   Do you recall on any of those reports that you
16   would receive was there any indication that the person
17   signing it was not an employee of Spine Imaging?
18        A.   No.
19        Q.   Was there any indication that the person signing
20   those reports was somehow an independent contractor to
21   Spine Imaging?
22        A.   No.
23        Q.   So looking at the report you would assume that
24   that person worked for Spine Imaging, whoever was
25   signing it?

1    A.    That the MRI tech would call and say this is not
2 understandable or can we do a better resolution.  If
3 they can't I would just send them somewhere else.
4    Q.    So the, so the image would be provided to you,
5 you'd have an opportunity to at least try to get it
6 corrected, and if it couldn't get corrected you would
7 send them somewhere else?
8    A.    Yes.
9    Q.    And do you recall doing that with Spine Imaging
10 at all?
11    A.    No, they had excellent resolution.
12    Q.    Have you ever provided any medication to any of
13 the patients that were undergoing scans?
14    A.    Yes, some of them are claustrophobic or severely
15 anxious so I have to give them something.
16    Q.    Okay.  How are you made aware of this
17 claustrophobic or this anxiety that they are going
18 through?
19    A.    We were faxed something that the patient is
20 claustrophobic or oversized, requires maybe some
21 sedative.
22    Q.    So that would come from Spine Imaging?
23    A.    They would fax something, yeah, to us, yes.
24    Q.    And did you ever prescribe some medication for
25 any patients that weren't your patients that you

1   referred to Spine Imaging?
2       A.   Numerous times, yes.
3       Q.   So you would prescribe medication for patients
4   that were not your patients?
5       A.   That were not my patients, yeah.
6       Q.   And that would have been at the request of Spine
7   Imaging?
8       A.   Yes.
9       Q.   And would you examine these patients?
10      A.   No, I would just try to get a history from them
11  of what's going on, are they already taking other
12  medications, do they have any problems, and just go
13  ahead and give them a very low dose sedative.  I'm
14  usually very conservative, so most of the time it worked
15  very well, even if they were oversized I would give them
16  a low dose.
17      Q.   So you would talk with these patients?
18      A.   No, no talking, no.  I just get a history from
19  the person who is faxing it, like from Jason or from one
20  of the techs that's doing the MRI.  Typically it would
21  be one of the techs that would do that.
22      Q.   Okay.  So a technician would be there taking a
23  medical history?
24      A.   Yes.
25      Q.   From the patient and then relaying that to you

1  and requesting that you give some kind of medication for
2  the purpose of --
3      A.  Yes.
4      Q.  -- relieving the anxiety for that particular
5  patient going through the MRI scan?
6      A.  Yes.
7      Q.  And you would not have seen that patient?
8      A.  No.
9      Q.  You would not have reviewed any medical records
10 relating to that patient?
11     A.  No.
12     Q.  You would have relied upon a history that would
13 have been taken by an MRI technician?
14     A.  Yes.
15     Q.  Okay.  I have no further questions.
16                    FURTHER EXAMINATION
17 BY MR. LOWDEN:
18     Q.  Mr. Morales, again, Michael Lowden.  I just have
19 a few follow-up questions.  I want to jump on that
20 issuing medications for some of the Spine Imaging
21 patients.  Did you get paid for that?
22     A.  No.
23     Q.  Did you have some kind of an agreement with
24 Spine Imaging that you would provide that medical
25 service?

1   A.   Did that on my own.  And I have other practices
2   that, that I knew were LLC's that I never, I thought
3   PLLC was something attorneys used.
4       Q.   Okay.  But my question was, you didn't have the
5   advice of counsel at that time?
6       A.   No.
7       Q.   You were asked questions about contrast, MRI's
8   with contrast.  You don't send patients down to Spine
9   Imaging, but are you aware whether Spine Imaging
10  performs MRI's with contrast or not?
11      A.   I'm not aware of that, no.
12      Q.   The, in terms of the anxious or obese patient
13  line of questioning.  You would get a fax and then you
14  would have a telephone call with a tech at Spine
15  Imaging, that's how that would work, right?
16      A.   Yes.
17      Q.   Okay.  And someone asked you whether you would
18  actually examine the patient and you said no, it was the
19  telephone call.  But who would actually deliver the
20  medication?
21      A.   Oh, I would prescribe the medication through a
22  pharmacy, we used to have a pharmacy down, or upstairs
23  in the first floor, and I would write the prescription
24  to give them a tablet or half a tablet of something.
25      Q.   Mm-hmm.

1    A.  And to sedate the patient.  Usually it was a
2  safe medication and they would give me the weight of the
3  patient to make sure I was giving an adequate dose.  And
4  then the receptionist would come up and pick it up or
5  Jason would come up and pick it up or they would send
6  somebody to come up and pick it up.
7    Q.  So how many times during the 12 years has that
8  happened?
9    A.  I can't tell you how many times, but it happened
10 several times.
11   Q.  More than a hundred?
12   A.  I don't think a hundred.
13   Q.  All right.  So less than a hundred?
14   A.  Much less, yes.
15   Q.  Okay.  More than ten?
16   A.  More than ten.
17   Q.  All right.  And more than 50?
18   A.  Not more than 50.
19   Q.  All right.  So somewhere between 50 and ten?
20   A.  Yes.
21   Q.  And on none of those occasions did you ever
22 actually witness physically the patient, right?
23        MR. MYERS:  Object to the form.
24   A.  A few times they had to come in because I was
25 concerned.  I mean, I can think of maybe a handful of

1   times where I said send them over because I need to see
2   if they had too many medical problems that I was
3   concerned with, I would go through that and do an exam,
4   but usually most of the time they did well.
5       Q.  Okay.  So in what, bear with me, what percentage
6   of these people who needed some sedatives did you
7   actually meet with in person?
8       A.  I'd say a quarter of them, 25 percent.
9       Q.  Okay, 25 percent.  And the question, you had the
10  question earlier, you never received payment for this
11  service even, even in those circumstances where you
12  actually had to evaluate the patient?
13      A.  No.  I, I think we couldn't really code on that
14  and sometimes I, I don't know if we would ever get paid
15  on it, so we would write it off.
16      Q.  You wouldn't bill Spine Imaging though for that
17  service?
18      A.  No.
19      Q.  And you weren't paid or --
20      A.  I think the person would have to directly bill
21  the insurance company, but I don't think the insurance
22  company would pay.
23      Q.  What about, last question on this topic, when
24  some of the patients that needed this sedative treatment
25  were actually patients of yours, you said some were from

1  other referral sources but some were yours?
2      A.   Yeah, a lot of them were ours.
3      Q.   And on those occasions where you had your own
4  Central Medical patient who ends up at the MRI and is
5  nervous or what have you and you get this fax and you go
6  through this machination of sedating them, you would
7  agree we would expect to find that fax and any other
8  documentation of that episode in the patient's chart,
9  right?
10     A.   Yes.
11     Q.   That would end up in the chart?
12     A.   It's in the chart, yes.
13     Q.   That's it. I have nothing further. Thank you,
14 Doctor.
15                     FURTHER EXAMINATION
16 BY MR. MORAN:
17     Q.   I just have a couple more here. Going back to
18 this issue of, of prescription of medication, Doctor, to
19 patients that were not being treated by you. You would
20 rely on the information that was provided to you by a
21 tech over the phone or pursuant to a fax, correct?
22     A.   Yes.
23     Q.   You would rely on that tech then to properly
24 relay to the patient what kind of medication was going
25 to be administered to the patient?

1   A. Yes.
2   Q. You would rely on the tech to properly advise
3   the patient as to potential complications that the
4   medication might have?
5        MR. MYERS: Object to the form.
6   A. Was I, can you repeat that.
7   Q. Would you rely on the tech to provide
8   information to the patient as to potential
9   complications?
10        MR. MYERS: Object to form.
11  A. Certain history, yes.
12  Q. But --
13  A. Get a certain history out of it.
14  Q. But in terms of communicating to the patient,
15  you're relying on the tech to be the conduit of
16  information to that patient as well?
17  A. Yes.
18        MR. MYERS: Object to form.
19  Q. It's not just the patient's information coming
20  to you, but you providing information to the tech which
21  in turn is relayed to the patient, correct?
22        MR. MYERS: Object to the form.
23  A. Yes.
24  Q. And that might include complications from the
25  medication?

1            MR. MYERS: Object to the form.
2    A. If we think there were any complications or
3 things that were sensitive, I would have them be
4 checked.
5    Q. But generally speaking, most medication has
6 stated indications and complications, correct?
7    A. Right.
8    Q. And would you rely on the tech to relay the
9 typical, this could cause you nausea, this could cause
10 you dizziness, that type of thing?
11            MR. MYERS: Object to the form.
12    A. Including the scan, yes. And the MRI scan you
13 can be claustrophobic, you can pass out, you can have
14 noise, you can have problems with the scan. Yes,
15 there's, it's their responsibility to talk to them about
16 this.
17    Q. And so at least in terms of when, when you were
18 prescribing medication to patients that weren't your
19 patients that you hadn't seen, you were relying on the
20 tech to provide this medical information to the
21 patients?
22            MR. MYERS: Same objections.
23    A. Yes.
24    Q. And then you would also rely on the tech to
25 provide information as to the purpose behind the

```
 1  medication?
 2       A.  Yes.
 3       Q.  I have no further questions.
 4              MR. LOWDEN:  Mr. Myers, I don't believe
 5  there's any further questions.
 6              MR. MYERS:  Okay.  The witness will read
 7  and sign.
 8              (Proceedings concluded at 2:51 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPORTER'S CERTIFICATE

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF WASHINGTON  )

    I hereby certify that I reported the deposition of Alfonso Morales on the 24th day of April 2012, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

    That the testimony was transcribed by me and is a true record of the testimony of the witness;

    That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

    That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

    That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

    That the right to read and sign the deposition by the witness was reserved.

    WITNESS MY HAND AND SEAL THIS 24th day of April 2012.

*[Signature: Kelley E. Zilles]*

Kelley E. Zilles, RPR
Notary Public, Washington County, Minnesota
My commission expires 1-31-2015